WILSON REALTY & CONSTR., INC. v. ASHEBORO-RANDOLPH BD. OF REALTORS, INC., 1997 NCBC 1

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF RANDOLPH | ) | SUPERIOR COURT DIVISION |
| | | FILE NO. 95 CVS 482 |
| WILSON REALTY & | ) | |
| CONSTRUCTION INC., BILLIE C. | ) | **ORDER** |
| WILSON, and VERNON WILSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ASHEBORO-RANDOLPH BOARD | ) | |
| OF REALTORS, INC., THOMAS A. | ) | |
| TROLLINGER, JAY KING, | ) | |
| AWEILDA WILLIAMS, BETTY | ) | |
| PELL, VICKIE LORIMER, PEGGY | ) | |
| HAMMER, WALTER COTTEN and | ) | |
| PAT COOPER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

{1} This case is before the court on separate motions for summary judgment filed by the defendant Asheboro-Randolph Board of Realtors, Inc. (hereinafter "Realtors Association") and the individual defendants who were each members of the Professional Standards Committee of the Realtors Association at the relevant times alleged in the complaint. For the reasons set forth below both motions are granted.

## I. PROCEDURAL BACKGROUND

{2} Wilson Realty and Construction, Inc. ("Wilson Realty") is the sole plaintiff left in this case. Prior to this matter being designated as an exceptional case, a Motion for Partial Summary Judgment against the individual plaintiffs, Billie C. Wilson and Vernon Wilson, was granted by Judge Steven Allen. The individual plaintiffs thereafter filed a Motion to Amend the Complaint and filed a Rule 60(b) motion to set aside Judge Allen's order granting partial summary judgment against the individual plaintiffs. Judge Allen denied both motions. Procedurally, defendants' motions are addressed to the remaining claims of Wilson Realty. Practically, the claims of Wilson Realty are predicated in large part upon the alleged actions of the Realtors Association and the individual defendants against Billie and Vernon Wilson. The court has considered those alleged actions in ruling upon the pending motions and the court's ruling would be the same irrespective of the status of Mr. and Mrs. Wilson as parties.

{3} In considering the pending motions the court has reviewed certain evidence proffered by the plaintiffs in the affidavit of Charles Grimes (the "Grimes affidavit") and the affidavit of Jerry Panz (the "Panz affidavit") and will address the applicability of that evidence at the appropriate point below.

{4} Each of the hearings before the Professional Standards Committee were transcribed and the court has reviewed those transcripts and the documents submitted at the hearings in detail. The court has reviewed each of the actions of the Board of Realtors separately and collectively in reaching its decision. As will be more fully discussed below, the court has also followed a three-step approach to examining those actions with respect to the pending motions. First, the court reviewed the actions for procedural fairness. Second, the court reviewed the actions to determine if they were substantially rational. Third, the court reviewed

each of the actions to determine if there was evidence to support the actions being a pretext for malicious and wanton action on the part of any defendant or if the actions were taken solely for anticompetitive reasons.

## II. FACTUAL BACKGROUND

### A. The Parties

{5} Wilson Realty is a North Carolina corporation doing business in Randolph County, North Carolina. It is engaged in several aspects of the real estate business, including construction and sale of homes, development and sale of residential building lots and brokerage of residential homes as agents for the owners pursuant to listing agreements. It is only the third aspect of Wilson Realty's business that is at issue in this case. In connection with its brokerage business Wilson Realty had historically belonged to the Realtors Association and used its Multiple Listing Service ("MLS").

{6} Billie C. Wilson and Vernon Wilson are husband and wife. They own Wilson Realty. Each is and continually has been an officer and director of the company. Each has been a real estate broker continuously holding a license from the North Carolina Real Estate Commission from at least 1974 to the present. Each was a member of the Realtors Association from 1981 until the events at issue in this case. Billie C. Wilson was a broker and their membership in the Realtors Association is by virtue of a contract. In fact, they allege that the Realtors Association has violated that contract. As a condition of membership in the Realtors Association each member agrees to follow and be bound by a code or standard of professional conduct commonly known as the "Code of Ethics" (amended complaint, paragraphs 16 and 17). The Realtors Association has a duly adopted set of bylaws which bind and control the association and its members.

{7} As a condition of membership in the National Association of Realtors, the Asheboro-Randolph Realtors Association was required to adopt and maintain a set of bylaws and code of ethics not inconsistent with guidelines and a code of ethics published by the NAR. In fact, the Realtors Association always adopted the NAR's guideline models and its rules of procedure and enforcement contained in the code of ethics and the Arbitration Manual (the "Manual") published by the NAR.

{8} Section nine of the Manual provides in pertinent part:

> Every member, for an in consideration of their right to invoke arbitration proceedings and to initiate complaints under the code of ethics as a member of the National Association of Realtors, hereby waive any right of action against the Board, any Board Member, or any member of a hearing panel or tribunal arising out of any decisions, determinations or other action taken or rendered under these procedures in the absence of willful and wanton conduct. (Emphasis supplied.)

{9} Like its members, the Realtors Association is bound by its bylaws, code of ethics and Manual. Enforcement of the code of ethics is accomplished through a simple process. That process is employed by Wilson Realty at the time of the 1993 complaint and hearing.

{10} The Realtors Association is a nonprofit corporation whose members engage in the listing, sale or appraisal of real estate in and around Asheboro, Randolph County, North Carolina. Membership is voluntary and by private contract. The Realtors Association does not license brokers and has nothing to do with the licensing process.[fn1] However, members of the Realtors Association must be licensed. The Realtors Association and each of its members are also members of the North Carolina Association of Realtors ("NCAR") and the National Association of Realtors ("NAR") .

{11} The individual defendants are members of the Realtors Association who were appointed by the president of the Realtors Association to serve on the Professional Standards Committee of the Realtors Association and also served as either a member of the 1993 or the 1994 hearing panel, or both, which

heard grievance complaints involving the plaintiffs. The individual defendants Walter Cotten, Vickie Lorimer, Peggy Hammer, Thomas Trollinger and Aweilda Williams all sat on the 1993 hearing panel. Jay King, Pat Cooper, Betty Pell, Thomas Trollinger and Aweilda Williams served on the 1994 hearing panel.

### B. Implications of Membership in the Realtors Association

{12} Plaintiffs allege in their amended complaint (paragraph 17) initiated by a complaint or grievance filed by (1) a member of the public, (2) another member, or (3) the Grievance Committee of the Association. Once filed, the complaint goes to the Grievance Committee which determines if the grievance is unfounded or should be sent to the Professional Standards Committee for hearing. If a grievance is sent to the Professional Standards Committee for a hearing, a panel of committee members is appointed to hear the grievance, recommend a finding and, if a violation is found, recommend a sanction. The final decision in any grievance procedure rests solely with the Board of Directors of the Realtors Association.

{13} The Realtors Association operates the MLS. The MLS is a service by which members of the Realtors Association publish and advertise exclusive listing agreements for the sale of property. When a broker publishes his or her listing in the MLS, he or she makes an offer to share commissions with other members of the Realtors Association who produce a buyer for the listed property. The Realtors Association disseminates sheets containing a new listing contemporaneously with the registration of a new listing by the listing agent. Use of the MLS is a key benefit of membership in the Realtors Association. It provides easily accessible current information on new properties available for sale and an automatic contractual arrangement with the agent who has an exclusive listing. Inaccessibility to the MLS is a severe restriction, but not an absolute bar to soliciting exclusive listing agreements from prospective sellers of residential property and selling property listed by others.

### C. The 1993 Complaint, Hearing and Sanctions

{14} The court has reviewed in detail the transcript of the ethics hearing held on May 25, 1993. At that hearing Mr. Pugh, counsel for Mr. and Mrs. Wilson and Bonnie Yorke, conceded that his clients had violated at least Rules 21 and 22, characterizing the Wilsons as "penitents." (Transcript, pages 18, 142.) Mr. Wilson admitted violating the rules. Mrs. Wilson admitted violating the rules. Mrs. Yorke admitted violating the rules.

{15} The 1993 complaint by Janet Hill arose out of the sale of a house owned by Dr. and Mrs. Ward. It is undisputed that Dr. and Mrs. Ward had a binding contract and listing agreement with Janet's Realty at the time of the sale of their house to the Houstons, which sale was handled by Mrs. Yorke and Mrs. Wilson. It is also undisputed that Mrs. Wilson and Mrs. Yorke were aware of that agreement at the time of the sale to the Houstons. Wilson Realty had previously had the listing for the house. It is undisputed that neither Mrs. Yorke nor Mrs. Wilson contacted Janet's Realty prior to showing the house at the end of November. It is undisputed that the contract was not presented to Janet's Realty. It is undisputed that Mrs. Wilson put a Wilson Realty sold sign in the yard of the Wards' home knowing there was an outstanding listing agreement with Janet's Realty and that thereafter Wilson Realty filed a comparable sales listing with the Board of Realtors falsely listing Wilson Realty as the listing agent. It is undisputed that no one from Wilson Realty contacted Janet's Realty at any time or in any way either before or after the sale to the Houstons and that Wilson Realty took the commission, albeit a reduced commission, on the sale of the house without any consultation with Janet's Realty.

{17} Mr. Pugh, counsel for the respondents, simply asked for lenience in punishment based upon the testimony that Mrs. Wilson and Mrs. Yorke erroneously believed that Dr. Ward's father, a licensed realtor, was associated with Janet's Realty and Dr. Ward's statement that he had "taken care of" everything. No one from Wilson Realty made any effort to confirm these facts. The fact that the Wilsons admitted the violations and presented themselves as "penitents" supports, if not compels, a conclusion that sufficient evidence was presented before the Ethics Hearing Committee to support its finding. Having admitted violating the ethics and rules, there can be no doubt that the Board was entitled to sanction Mrs. Wilson

and Mrs. Yorke. The Professional Standards Committee recommended sanctions, which the Board of Directors subsequently adopted. There is no dispute that the sanctions imposed, while heavy, were within the limits provided by the Manual. Pursuant to the sanctions imposed, Mrs. Wilson's membership in the Board of Realtors was suspended for one year and she was required to sever her relationship with Wilson Realty during that time. She was effectively denied access to the MLS during that period and could not, therefore, list properties for sale on the MLS. That restriction did not apply to Wilson Realty.

{18} Two things are important to note with respect to the 1993 violations. First, the actions which were later admitted to be violations were taken freely and voluntarily by the Wilsons. No member of the Board of Realtors had any hand in inducing the action. No member of the Board of Realtors asked or suggested to Janet Hill that she file a complaint. She filed the complaint after discovering that a house for which she held an exclusive listing agreement had been sold by another realtor without her knowledge and without compensation to her. The fact that she filed a complaint under those circumstances is not surprising and does not constitute evidence of any conspiracy or willful and wanton conduct. There is not one piece of evidence in the record to suggest that any conspiracy existed to injure the Wilsons or Wilson Realty at the time of the 1993 hearing. The only evidence of conspiracy that the Wilsons asserted is that the penalties imposed were harsh, but concededly permissible under the rules.

{19} Second, the Wilsons raised no objection to any part of the proceeding in the hearing process. They were represented by counsel who stated at the conclusion of the hearing, in response to direct questions from the committee chairman, that he felt his clients had received a fair hearing and had had adequate opportunity to testify, present evidence and witnesses and conduct cross-examination. (Transcript pages 147-148.)

### D. The 1994 Complaints, Hearing and Sanctions

{20} The 1994 complaint against Billie Wilson was filed by Anne Vick and arose out of an offer made on a house owned by Helen West in Asheboro, North Carolina. The house was listed with Wilson Realty with Vernon Wilson as listing agent. Mrs. Wilson was showing the house one afternoon as a buyer's agent working with a couple she represented. At some point while she was showing the house to her clients, Mrs. Cassandra Ruffin approached her and asked to look at the house. Mrs. Wilson spent time with Mrs. Ruffin showing her the house and discussing financing and monthly payments with her. Mrs. Ruffin left the house and contacted Anne Vick, a realtor she had previously worked with, and asked Mrs. Vick to prepare an offer for her and submit it. Mrs. Vick prepared an offer for $50,000 and took it to the home of Vernon and Billie Wilson. Vernon Wilson was not home. Mrs.Vick left the offer with Mrs. Wilson and some discussions took place between them concerning the fact that Mrs. Wilson had shown the house to Mrs. Ruffin previously. When Mrs. Vick left the Wilson home, Mrs. Wilson called Cassandra Ruffin. As a result of that conversation, Mrs. Ruffin called Mrs. Vick that same night and requested that her offer be withdrawn immediately. Mrs. Vick complied with her request. The offer was thus never conveyed to the homeowner. Mrs. Wilson admits that sometime during her discussions with Mrs. Ruffin that she disclosed the fact that she knew the owner well and that the owner had previously turned down an offer of $55,000. Mrs. Wilson testified that conversation occurred in the afternoon when she had met with Cassandra Ruffin at the house. There was evidence at the hearing from which the Ethics Hearing Panel could have rationally concluded that the information was disclosed during the telephone conversation between Mrs. Wilson and Mrs. Ruffin after the offer was received and that the information in Mrs. Wilson's phone call to Mrs. Ruffin prompted Mrs. Ruffin to withdraw her offer. As a result the homeowner lost a potential sale and Mrs. Vick lost a potential commission. Just as in the 1993 case involving the Ward home, there was evidence that Mrs. Wilson's conduct caused another realtor to lose a commission on the sale of a home. The Ethics Hearing Panel found that the intent of Mrs. Wilson's telephone call was to discourage Mrs. Ruffin from presenting her offer through Mrs. Vick. There was sufficient evidence in the record to support that finding.

{21} The Ethics Hearing Panel found that Mrs. Wilson's conduct violated Articles 6, 7, 21 and 22 of the Code of Ethics and recommended a $2500 fine and expulsion from the Realtors Association for two years.

The Board of Directors adopted the findings of the Ethics Hearing Panel and approved the recommended sanctions.

{22} The 1994 complaint against Wilson Realty was initiated by the Grievance Committee of the Board of Realtors. In essence, Wilson Realty, and by clear implication Billie Wilson, were charged with failing to comply with that portion of the previous decision arising out of the 1993 hearings which directed Wilson Realty and Billie Wilson to sever their relationship. The complaint filed by the Grievance Committee was directed to Wilson Realty and not to Billie Wilson and thus there were no charges pending against Billie Wilson for violation of the requirement of the 1993 sanctions that she sever her relationship with Wilson Realty. The Ethics Hearing Panel found that Wilson Realty had permitted Billie Wilson to continue to use its facilities and MLS listing rights and that she had actually acted as the listing agent in at least three situations in which Wilson Realty listed homes on the MLS under the names of other agents, including Vernon Wilson.

{23} It was undisputed that Mrs. Wilson had used the Wilson Realty fax machine on at least one occasion and that she had attended open houses being conducted by Wilson Realty and was an officer and director of the company. Mrs. Wilson took the position that she attended the open houses as an invited guest of the Wilson Realty agents and she used the fax machine as a convenience on one occasion. It is clear that she had set up a separate office at her home to act as a buyer's agent during the period of her suspension.

{24} The evidence with respect to Wilson Realty listing homes on the Multiple Listing Service in the name of other agents for which the owners understood Billie Wilson to be the listing agent was hotly contested and the evidence is in conflict. In summary, the investigator for the Grievance Committee called three homeowners, Betty Weaver, Jim Swaringen and Helen West, and was originally told by each that Billie Wilson was listing agent for their homes. Mrs. West owned the home on which Mrs. Ruffin made the offer which was withdrawn. Mrs. Weaver and Mrs. West are elderly, and at least Mrs. Weaver has significant health problems. Neither appeared at the hearing. Each provided an affidavit which contradicted the testimony of the investigator for the Grievance Committee. Mr. Swaringen testified at the hearing that although he had originally told the investigator that his house was listed by Billie Wilson, he had been in error. It is clear that each of the homeowners had been contacted by the Wilsons or their counsel. Whether to believe their first or second statement was a decision for the Hearing Panel.

### III. LEGAL STANDARD TO BE APPLIED

{25} At the outset the court must determine the legal standards to be applied in reviewing cases involving disciplinary procedures of voluntary membership organizations. Where a group of people or businesses have come together voluntarily to collectively further their business interests, many competing interests arise. Generally organizations such as the Board of Realtors are voluntary membership organizations without substantial assets. They function through volunteer service by their members. They need some means of ensuring that all members operate within the rules and regulations of the organization. Those rules and regulations are generally enforced by members who are appointed to serve on grievance or disciplinary committees. Both the organization and the members who voluntarily serve on the committees have an interest in being protected from suit by individual members who have been adversely affected by actions, particularly of a disciplinary nature, attributable to the organization. Accordingly, these kinds of organizations frequently attempt to avoid litigation by imposing a waiver of any right to sue as a condition of membership. Such waivers have the salutary effect of reducing the claims filed against the organization and its members who volunteer their services.

{26} Members of such organizations join them because there exists a value to or benefit from membership. In the case of boards of realtors, one of the significant benefits of membership is access to the Multiple Listing Service. Access to or exclusion from the MLS has an economic impact on the member. Thus, boards of realtors are in a position, through their disciplinary proceedings, to have significant economic impact an members which extends beyond mere membership and actually affects their ability to compete. Members naturally expect that the organization will not willfully, wantonly, arbitrarily or capriciously use

its power to effect them adversely or invoke disciplinary proceedings and penalties simply to financially benefit other members of the organization. Because of the potential impact of their decisions, neither the organization nor individuals acting on its behalf are entitled to absolute immunity from suit.

{27} The most recent decision of the North Carolina Appellate Courts dealing with these conflicting interests and the obligations of the judiciary in reviewing disciplinary decisions of boards of realtors is *Gaston Board of Realtors v. Harrison,* 64 N.C. App. 20. 207 S.E.2d, 809 (1983) (hereinafter cited as *Harrison).* The majority opinion holds that the relationship between a private voluntary association and its members is contractual in nature and defendant's substantive rights are derived solely from his contract with the association. The majority opinion does hold that expulsion from the board can harm a member professionally and economically and therefore members must be afforded some procedural due process before expulsion. The majority opinion held in pertinent part:

> Accordingly, defendant's expulsion is subject to judicial review to determine, first, that the contract terms were not contrary to public policy, . . . and, second, that the expulsion was conducted according to plaintiff's rules, which are the terms of the contract with defendant.
>
> . . . .
>
> Without attempting to define how much due process is due, we hold that the procedures followed by plaintiff were adequate to protect defendant's constitutional rights. Defendant received timely notice of the complaint was given an opportunity to present evidence and cross-examine opposing witnesses, and was represented by counsel. The hearing panel consisted of impartial persons. Subpoena power, which is part of the state's police power not available to private associations, and formal rules of evidence are not constitutionally required by private disciplinary proceedings.

{28} The majority opinion affirmed the trial court in dismissing the case upon a finding that the proceedings were fairly conducted in accordance with rules that did not violate public policy.

{29} In this case the Board of Realtors has agreed that it is bound by the NAR Code of Ethics which establishes its contractual obligation. The NAR Code of Ethics provides:

> Due process is not a difficult concept, but an essential one. Due process means nothing more or less than the right to a full and fair hearing before an impartial tribunal with a full and complete knowledge of the charges made and with adequate opportunity to prepare a defense.

{30} Accordingly, the court will be guided by the language in the majority opinion in the *Harrison* case and the NAR definition of due process.

{31} In the *Harrison* case, Judge Johnson wrote a strong dissenting opinion, which is well reasoned and raises an issue upon which the court is unclear. Judge Johnson concludes that the majority implicitly held that a court should not reweigh the facts and substitute its judgment for that of the association. Judge Johnson would have broadened the standard for review not necessarily to reweigh the facts and substitute judicial judgment for that of the association, but to include a judicial determination that the board's substantive decision was based upon substantial evidence, was rational, reasonably related to legitimate professional purposes of the organization, made in good faith and not contrary to public policy. In his view, the proper scope of judicial review is to determine whether the action taken or proposed is both "substantively rational and procedurally fair." The *Harrison* decision was a declaratory judgment action and there were no claims asserted in that case for alleged anticompetitive activity of any kind. Accordingly, the *Harrison* decision does not address those issues.

{32} In order to ensure that this court has applied the proper standard of review, its decision is based upon a three-step analysis of the Board's action. First, the court reviewed each complaint and disciplinary action for procedural fairness. Second, the court determined whether or not the Board's decision was

substantively rational. Third, the court reviewed the entire record to determine if there is any genuine issue of material fact with regard to whether or not the actions of the realtors association were willful and wanton or taken for anticompetitive purposes. In this manner, the appellate court, if it determines to expand the holding in *Harrison* beyond procedural review, will have the benefit of the trial court's decision with respect to whether or not the decision was substantively rational and whether or not any evidence existed to support a claim that the Board's actions, even if procedurally fair and substantively rational, were nonetheless willful, wanton and malicious or taken for anticompetitive purposes. The court will make three findings with respect to each of the four complaints on which a decision was made by the Board. In doing so the court will deal with the two key evidentiary disputes bearing on its decision.

{33} Procedurally, none of the objections raised by the plaintiffs rises to the level of fundamental unfairness. The court believes that the Codes of Ethics, Bylaws and Manual of the Board of Realtors do not violate public policy. With respect to the 1993 hearings and plaintiffs' complaint that Dr. Ward could not be subpoenaed to testify, the *Harrison* case makes it clear that absence of subpoena power is not a violation of due process. That is the only procedural claim asserted by plaintiffs' counsel during the 1993 hearings. Other than that complaint about the process, plaintiffs' counsel raised no objection to the procedure and, in fact, asserted that plaintiffs had been treated fairly. The court's review of the record confirms the procedural fairness of the 1993 proceeding.

{34} With respect to the 1994 hearings, the court's review of the transcript does not reveal any fundamental unfairness in the process. Plaintiffs' claims that the panel members did not sign their certificates until after the hearing had started is a technical failure which the court does not find to be a fundamental denial of due process or to have prejudiced the plaintiffs in any way. The failure to call Mrs. Gallimore is likewise covered by the *Harrison* decision on subpoena power and, in any event, Mrs. Gallimore had no firsthand knowledge of the conversations between Mrs. Wilson and Cassandra Ruffin. At most, her involvement consisted of helping Mrs. Vick draft her complaint.

{35} Plaintiffs argue that there is sufficient admissible evidence that the 1993 hearing panel was not impartial. Defendants agree that they were obligated to be impartial. Plaintiffs' evidence of impartiality with respect to the 1993 hearings is based primarily on the affidavit of Jerry Panz.

{36} The court has examined the proffered testimony of Jerry Panz, Executive Director of the High Point Board of Realtors. In essence, Mr. Panz's affidavits are offered to show that the actions of the Realtors Association were not substantively rational and therefore the product of a biased panel. Plaintiffs argue that Mr. Panz's opinion that no unbiased hearing panel would have or could have reached the conclusions that the 1993 and 1994 Ethic Hearing Panels reached defeats summary judgment in this case, relying on the case of *Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810 (11th Circuit 1990). The court is not persuaded that the Panz affidavits defeat summary judgment for a number of reasons.

{37} First, Mr. Panz's analysis and interpretation of the Code of Ethics and the complaints and decisions in this case constitute the same review which this court must make as a matter of law in determining whether or not the actions of the Realtors Association were substantively rational. As such, his opinions may be helpful to the court in analyzing the situation, but cannot create a question of fact to be determined by a jury.

{38} Second, the opinions on their face indicate that they are the "personal opinions" of Mr. Panz. As such, they are not admissible.

{39} Third, Mr. Panz either did not review the transcript of the 1993 hearings or chose to ignore the fact that counsel for Mr. and Mrs. Wilson and the Wilsons themselves admitted violations of the Code of Ethics in the 1993 hearings. In light of that glaring omission, the court finds that the proffered opinion with respect to the 1993 hearings is inadmissible. In determining the testimony to be inadmissible, the court is exercising its inherent authority to review such opinion pursuant to *State v. Goode,* 241 N.C. 513, 461 S.E.2d, 631 (1995), which cites with approval the decision of the United States Supreme Court in

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 125 L.Ed.2d 469 (1993).

{40} Fourth, Mr. Panz's affidavit with respect to the 1994 hearing does not address the complaint and penalties against Wilson Realty and therefore creates no issue of fact with respect to the complaint against Wilson Realty.

{41} Fifth, the opinion that no ethics hearing panel would have reached the same conclusions reached by the Ethics Hearing Panels in 1993 and 1994 is inadmissible because the court finds that Mr. Panz is not qualified by experience or training to express that opinion.

{42} Based on the five grounds cited above, the Court concludes that the case of *Bolt v. Halifax Hospital Medical Center* is not apposite or controlling in this situation. Nor does the court believe that the North Carolina Appellate Courts would follow that decision in cases involving the review of decisions of voluntary membership organizations.

{43} The affidavit of Charles Grimes was also offered to defeat summary judgment and establish bias of the 1994 Ethics Hearing Panel. It is offered to establish statements made by Mr. Eggleston, counsel for the Realtors Association, prior to the 1994 hearing. Mr. Eggleston is alleged to have said that certain unnamed "members of the Board of Realtors" were upset with Mr. Wilson for statements made to the effect that he would spend everything he had to defend his wife against charges brought by the Realtors Association and that if plaintiffs did not settle prior to the scheduled hearing the Realtors Association would impose maximum penalties on them. The court holds that this proffered testimony is inadmissible for several reasons. First, the court believes that it is bound by Judge Allen's earlier decision that the testimony was inadmissible and thus not grounds for disqualification of Mr. Eggleston. Second, the court, if it had discretion, would come to the same conclusion reached by Judge Allen. Although no offer was on the table, Mr. Eggleston's forecast of what could or would happen was in the context of a negotiation trying to resolve the matter short of hearing. If such discussions can easily be used to disqualify counsel and prejudice clients, it would have a chilling effect on open and frank settlement discussions.

{44} Plaintiffs' contention that the 1994 Hearing Panel was biased because two of the five members of the 1994 panel were also members of the 1993 Hearing Panel is without merit. The majority of the 1994 Hearing Panel was new. Mr. Trollinger and Mrs. Williams were not automatically disqualified by having been on the 1993 panel. The final decision was made by the Board of Directors based on the recommendation of the Hearing Panel. Under those circumstances the court does not believe the plaintiffs were denied due process by the presence of Mr. Trollinger and Mrs. Williams on the 1994 panel.

{45} In summary, the court concludes on review of the record of each of the hearings that plaintiffs were afforded the fundamental due process required under the *Harrison* case majority opinion and that the determination is one of law for the court, not fact for the jury. The court also concludes that there do not exist genuine issues of material fact to be determined by a jury in connection with the court's determination of procedural fairness. The court specifically holds that the evidence proffered in the Grimes affidavit is inadmissible and the opinions offered by Mr. Panz that no unbiased ethics hearing panel would have reached the same conclusion as those reached in this case are inadmissible. The court has considered Mr. Panz's affidavit to the extent it provides useful information with respect to the court's review of the interpretations of the Codes of Ethics by the hearing panels and the Board of Directors of the Realtors Association. Again, those decisions are determinations of law to be made by the court.

{46} The court next turns to a determination of the substantive rationality of the decisions of the Realtors Association in both cases. This analysis is based upon the dissenting opinion in *Harrison,* which would have added a second prong to the court's review of the disciplinary actions of voluntary membership organizations, such as boards of realtors. Again, this determination is one of law for the court.

{47} The 1993 case is easy. The plaintiffs admitted violations. Faced with those admissions, a finding that violations occurred was clearly rational.

{48} The 1994 complaint against Billie Wilson by Ann Vick revolved around very few disputed facts. Those factual disputes were resolved against Mrs. Wilson. The court finds that there was a clear factual basis for the findings of the Ethics Hearing Panel on the complaint filed by Ann Vick. The court also finds that the determination that the facts found supported violations of the Code of Ethics was rational. The Realtors Association's interpretation of its own rules and regulations is entitled to some deference and should not be the subject of a claim against the Realtors Association or Ethics Hearing Panel members unless there are no facts to support the findings or the interpretation of the code, rules and regulations based upon the facts is not rational. The court finds neither situation to exist with respect to the Vick complaint against Mrs. Wilson.

{49} The 1994 complaint by the grievance committee against Wilson Realty revolved around hotly disputed facts. There was a basis to support the Ethics Hearing Panel findings and there would also have been a basis for finding no violation occurred at all. Neither the court nor a jury may substitute its judgment where evidence exists in the record to support the facts found, even though the record would support a contrary finding. The Ethics Hearing Panel members had the benefit of seeing and hearing the testimony and of determining the credibility of the witnesses. Since there was a basis for the Ethics Hearing Panel decision that the Wilsons had evaded the restrictions imposed as a result of the 1993 penalties imposed, the interpretation of the code and finding a violation thereof by the Ethics Hearing Panel was rational and should not be disturbed.

{50} The Court has also reviewed one other aspect of the decisions of the Realtors Association and its Ethics Hearing panel, which appears to the court to be at the crux of this entire dispute. The penalties imposed in connection with both the 1993 and 1994 complaints were the maximum permitted under the Manual and the Realtors Association's rules and regulations. But for the severity of the penalties, particularly the loss of MLS privileges for Wilson Realty, it is unlikely that this case would be in court. The penalties were, in the court's view, harsh. The court, had it been imposing penalties in this case, might have chosen less onerous ones under the circumstances, particularly in view of the disputed facts at issue in the grievance committee complaint against Wilson Realty. However, the penalties were within the prescribed rules and regulations of the Realtors Association to which the plaintiffs contractually agreed to be bound. As long as they are supported by facts and rational interpretation of the regulations, they should not be disturbed. If the 1994 Ethics Hearing Panel, after seeing and hearing the witnesses, concluded that Vernon Wilson and Billie Wilson had evaded the earlier penalty by allowing Billie Wilson to handle listings as a "listing agent" in the client's view and putting someone else's name on the MLS sheet, it is understandable that they would view expulsion as a rational penalty. With respect to Mrs. Wilson, she had been found on two occasions to have taken actions in violation of the code, which resulted in other realtors losing actual or potential commissions. Given the conclusions of the Ethics Hearing Panels in 1993 and 1994, it was not irrational that they determined that severe penalties were necessary in order to get the attention of the Wilsons and Wilson Realty. The court cannot conclude on the record before it that the penalties, though harsh and perhaps not those that the court would have imposed, were irrational and without basis.

{51} The last issue the court will review in this order is the question of the evidence or lack thereof to support plaintiffs' claims of conspiracy to restrain trade. That issue was not before the court in *Harrison.* Having found that the plaintiffs were afforded due process required by the state and their contract and that the decisions of the Realtors Association were substantively rational, the burden is on the plaintiffs to come forward with some evidence outside of or apart from the hearings and decisions themselves to support a conspiracy theory. The plaintiffs must come forward with some evidence that tends to exclude the possibility that the alleged conspirators acted independently. See *Parkway Furniture Gallery, Inc. v. Pennsylvania House,* 878 F.2d 801 (4th Cir. 1989).

{52} The only evidence proffered by the plaintiffs is the opinion of Jerry Panz that no unbiased hearing panel would have done what was done in this case and the alleged statements in the Grimes affidavit. The court has ruled the evidence relied upon in those affidavits inadmissible. The court has scoured the record and asked counsel in oral argument what other evidence existed to support a conspiracy theory. The court

can find no evidence of who conspired with whom to do what or when they conspired or how. Both the 1993 and 1994 complaints against Mrs. Wilson arose out of actions she took, which resulted in potential lost commission. That the other agents involved would file complaints under those circumstances is no evidence of conspiracy. There is no relation between the two incidents and no evidence adduced of any connection between the two. The conspiracy alleged would have had to be substantial in scope and number of people involved. The members of the Board of Directors in 1993 and 1994 would have had to be members of the conspiracy since they had the final vote and decision. They are not even parties to the lawsuit. Accordingly, the court finds that there are no genuine issues of material fact with respect to the claims based upon conspiracy to restrain trade and no evidence to support them.

{53} Based upon the foregoing findings and conclusions, it is ORDERED:

1. The motion of Asheboro-Randolph Realtors, Inc., for summary judgment is granted and the remaining claims of Wilson Realty and Construction, Inc., against the Asheboro-Randolph Board of Realtors, Inc., are dismissed with prejudice.

2. The motion for summary judgment of Thomas A. Trollinger, Jay King, Aweilda Williams, Betty Pell, Vickie Lorimer, Peggy Hammer, Walter Cotten and Pat Cooper is granted, and the claims against those individual defendants by Wilson Realty and Construction, Inc., are dismissed with prejudice.

3. The affidavits of Jerry Panz are determined to be inadmissible for the reasons set forth above.

4. The affidavit of Charles Grimes and the evidence proffered therein are determined to be inadmissible.

5. Judgment is hereby entered in favor of defendants dismissing all claims.

6. Each party shall bear its own costs.

This 30th day of September, 1997.

_____

Footnote 1. By statute the North Carolina Real Estate Licensing Commission has sole authority to grant or revoke licenses.